**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
IN RE: LATRICIA L. HARDY,           )
                                    )
          DEBTOR.                   )
------------------------------)
                                    )
LATRICIA L. HARDY,                  )
                                    )
          Appellant,                )
                                    )
     v.                             )  Civil Action No. 16-1968 (EGS)
                                    )
BRYAN S. ROSS, and ALL CREDIT       )
CONSIDERED MORTGAGE, INC.,          )
                                    )
          Appellees.                )
_____)
                                    )
LATRICIA L. HARDY,                  )
                                    )
          Appellant,                )
                                    )
     v.                             )  Civil Action No. 16-1969 (EGS)
                                    )
BRYAN S. ROSS, and ALL CREDIT       )
CONSIDERED MORTGAGE, INC.,          )
                                    )
          Appellees.                )
_____)
                                    )
LATRICIA L. HARDY,                  )
                                    )
          Appellant,                )
                                    )
     v.                             )  Civil Action No. 16-1970 (EGS)
                                    )
BRYAN S. ROSS, and ALL CREDIT       )
CONSIDERED MORTGAGE, INC.,          )
                                    )
          Appellees.                )
_____)

## MEMORANDUM OPINION

Currently pending before the court is appellant LaTricia L. Hardy's motion for an emergency temporary restraining order, which, based on the substance of the motion and the relief requested, the Court construes as a motion to stay two bankruptcy court orders pending appeal of those orders in this Court. *See* Mot. for an Emergency TRO ("Appellant's Mot."), ECF No. 10. Upon consideration of the motion, the responses thereto, the applicable law, and the entire record, Ms. Hardy's motion for a stay pending appeal is **DENIED**.

## I.  Background

On May 31, 2016, Ms. Hardy filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Columbia. Appellee ACC Mortgage's Mem. in Opp. to Appellant's Mot. for Emergency TRO ("ACC's Opp."), ECF No. 11 at 2; Chapter 7 Trustee's Opp. to Debtor's Mot. for TRO ("Trustee's Opp."), ECF No. 13 at 1; Trustee's Appellate Appendix ("AA"), ECF No. 12-1 at 21-22. On June 14, 2016, the Chapter 13 Trustee moved to dismiss with prejudice. ACC's Opp. at 2. On June 17, 2016, Ms. Hardy filed a motion to convert the case to Chapter 11. *Id.*; AA at 23-24. On June 24, 2016, All Credit Considered Mortgage, Inc. ("ACC"), a creditor holding a mortgage claim on Ms. Hardy's co-owned commercial property located at 1414-1416 Pennsylvania Avenue,

Southeast, Washington, D.C. 20003, in turn filed a motion to dismiss with prejudice or, in the alternative, to convert the case to Chapter 7 and opposed Ms. Hardy's motion to convert to Chapter 11. ACC's Opp. at 2; AA at 25-42. The bankruptcy court held a hearing on the Chapter 13 Trustee's motion to dismiss and Ms. Hardy's motion to convert to Chapter 11 on July 15, 2016, and on July 25, 2016, that court issued an order converting the case from Chapter 13 to Chapter 7. ACC's Opp. at 2-3; Trustee's Opp. at 1; AA at 123-25.[1] On August 30, 2016, Ms. Hardy filed a "motion requesting termination of conversion to Chapter 7 liquidation." ACC's Opp. at 3; AA at 149-50. The bankruptcy court issued an order denying that motion on September 15, 2016. ACC's Opp. at 3; AA at 156. Ms. Hardy noticed her appeal of that order in this Court on September 22, 2016. Notice of Appeal and Statement of Election, ECF No. 1, Civil Action No. 16-1970.[2]

Meanwhile on August 17, 2016, the Chapter 7 Trustee, Bryan S. Ross, filed a motion for an order approving the turnover of real property——namely, Ms. Hardy's co-owned commercial property on Pennsylvania Avenue. ACC's Opp. at 3; AA at 126-31. Ms. Hardy

---

[1] The bankruptcy court's docket includes only an audio recording of the July 15, 2016 hearing. This Court requested that a transcript of that hearing be prepared. That transcript is attached to this Memorandum Opinion.

[2] The Court *sua sponte* consolidated Ms. Hardy's appeals, finding that they involved common issues of law and fact and grew out of the same event. Minute Entries of October 5, 2016, Civil Action Nos. 16-1969 and 16-1970.

did not file any opposition to this motion, Trustee's Opp. at 1, though she contends that she failed to do so because she did not receive notice of the Trustee's turnover motion. Appellant's Mot. at 1; Appellant's Merits Br., ECF No. 9 at 16-17. The bankruptcy court granted the turnover motion on September 9, 2016. Appellant's Mot. at 1; Trustee's Opp. at 1; AA at 151-52. Ms. Hardy noticed her appeal of that order in this Court on September 22, 2016. Notice of Appeal and Statement of Election, ECF No. 1.

On September 19, 2016, the bankruptcy court issued an "order clarifying that no stay of the court's turnover order is in place pending disposition of the motion for a stay" of the turnover order that Ms. Hardy had filed in that court on September 16, 2016. AA at 157. Ms. Hardy noticed an appeal of that clarifying order along with her two other appeals in this Court on September 22, 2016. Notice of Appeal and Statement of Election, ECF No. 1, Civil Action No. 16-1969. The bankruptcy court subsequently denied Ms. Hardy's motion for a stay of the turnover order on September 27, 2016, ACC's Opp. at 3, and on October 1, 2016 denied an additional motion she had filed that sought to stay the turnover order, the order denying "termination" of conversion, and the clarifying order. Trustee's Opp. at 2.

On November 21, 2016, Ms. Hardy filed in this Court a motion for an emergency temporary restraining order, which, as indicated above, is best construed as a motion for a stay of the bankruptcy court's order denying her motion to "terminate" the conversion from Chapter 13 to Chapter 7 and that court's order granting the Chapter 7 Trustee's turnover motion pending appeal of those orders in this Court. *See* Appellant's Mot. at 3.

## II. Analysis

"A motion for a stay pending appeal in a bankruptcy case is reviewed under the same standard employed in evaluating a request for a preliminary injunction." *In re Spenlinhauer*, No. 15-14223, 2016 WL 526200, at *1 (D. Mass. Feb. 9, 2016). Accordingly, to be entitled to a stay, Ms. Hardy must show: (1) that she has a strong likelihood of success on the merits; (2) that she will suffer irreparable injury if injunctive relief is denied; (3) that other interested parties will not suffer substantial harm if injunctive relief is granted; and (4) that the public interest favors the granting of injunctive relief, or at least, that the granting of injunctive relief is not adverse to the public interest. *Wolensky Ltd. P'ship v. 2000 Pennsylvania Ave, N.W., Inc.*, No. 91-2348, 1991 WL 229898, at *1 (D.D.C. Oct. 21, 1991).[3] "A district court must balance the

---

[3] As indicated, in addition to her appeals of the turnover order and the order denying "termination" of conversion, Ms. Hardy has

strengths of the requesting party's arguments in each of the four required areas." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks omitted). Here, that balance tips against granting Ms. Hardy's motion for a stay.

### A.    Likelihood of Success on the Merits

Ms. Hardy has not demonstrated a strong likelihood of success on the merits of her appeal.

### 1.    Appeal of Order Denying Motion Requesting Termination of Conversion to Chapter 7

Ms. Hardy has not appealed the order converting the case from Chapter 13 to Chapter 7; instead, as the Trustee points out, Br. of Appellee Bryan Ross ("Trustee's Merits Br."), ECF No. 12 at 6, she has appealed the order denying her motion requesting "termination" of the conversion to Chapter 7. Notice of Appeal and Statement of Election, ECF No. 1, Civil Action No. 16-1970. Thus she is effectively appealing an order denying a motion for reconsideration. Federal Rule of Bankruptcy Procedure

---

noticed an appeal of the bankruptcy court order clarifying that the turnover order was not stayed pending that court's disposition of her first motion for a stay. This Court construes her appeal of that order to be an appeal of the bankruptcy court's orders of September 27, 2016 and October 1, 2016 that actually denied her motions for a stay pending appeal. The four factor preliminary injunction analysis is applicable to the appeal from the bankruptcy court's denial of those motions and the motion for the stay pending appeal that was filed in this Court.

9024 contemplates motions for reconsideration and applies Federal Rule of Civil Procedure 60 to such motions in the bankruptcy realm. Fed. R. Bankr. P. 9024.[4] On appeal, an order denying a motion for reconsideration is reviewed for abuse of discretion. *In re Hahn*, No. 12-13247, 2012 WL 5908703, at *1 (E.D. Mich. Nov. 26, 2012). The bankruptcy court can be said to have abused its discretion if it "did not apply the correct legal standard or misapprehended the underlying substantive law" or if its ruling was not "within the scope of permissible alternatives in light of the relevant factors and the reasons given to support it." *Smalls v. United States*, 471 F.3d 186, 191 (D.C. Cir. 2006). The bankruptcy court did not abuse its discretion in denying Ms. Hardy's motion for reconsideration of its order converting the case to Chapter 7.

---

[4] Rule 60(b) provides in full:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Ms. Hardy's primary argument as to why the bankruptcy court erred in denying her "termination" motion is that she is involved in litigation in the District of Columbia courts with creditor ACC concerning whether ACC's mortgage as to her co-owned Pennsylvania Avenue property is valid and enforceable, and, accordingly, given that ACC's claim is disputed based on that litigation, ACC lacked the standing required to move for dismissal or, in the alternative, conversion to Chapter 7 in the bankruptcy court. *See* Appellant's Mot. at 2-3; Appellant's Merits Br. at 5, 9-12, 16-19. This argument likely fails at the starting gate because it challenges the merits of the underlying order——the conversion order——rather than the order from which appeal was taken——the order denying the motion for reconsideration. *See In re Schueller*, 124 B.R. 98, 100 (D. Colo. 1991) (explaining that district court review of an appeal from a denial of a motion for reconsideration is "limited to considering whether the bankruptcy court abused its discretion in denying the motion [for reconsideration], not whether the court erred as a matter of law in granting the [underlying] motion in the first place").

In any event, Ms. Hardy's argument is unavailing. First, Chapter 13 specifies that "on request of a party in interest or the United States trustee . . . the court may convert a case under [Chapter 13] to a case under [C]hapter 7 . . . or may

dismiss a case under [Chapter 13], whichever is in the best interests of creditors and the estate, for cause . . . ." 11 U.S.C. § 1307(c). Here, the Chapter 13 Trustee filed a motion to dismiss, separate and apart from creditor ACC's motion to dismiss or, in the alternative, to convert to Chapter 7. ACC's Opp. at 2. Based on just the Chapter 13 Trustee's motion to dismiss, the bankruptcy court was statutorily mandated to consider conversion to Chapter 7 because section 1307(c) requires a two-part analysis: (1) a determination of "cause" justifying dismissal or conversion and then, if there is "cause," (2) a decision between dismissal or conversion based not on which of those two options the moving party requests, but rather based on "the best interests of creditors and the estate." *In re Jensen*, 425 B.R. 105, 109 (Bankr. S.D.N.Y. 2010) ("The Court may convert the case rather than dismiss it if conversion 'is in the best interests of creditors and the estate.'") (quoting 11 U.S.C. § 1307(c)); *see In re Ontiveros*, No. 12-12457, 2014 WL 347726, at *4 (Bankr. D.N.M. Jan. 31, 2014) (finding "cause" to support conversion or dismissal and then making decision between conversion or dismissal based on "the best interests of creditors and the estate" even when the moving parties had only requested dismissal). The bankruptcy court in this case explicitly acknowledged the need to assess "the best interests of creditors and the estate." *See* July 15,

2016 Hrg. Tr. ("Hrg. Tr.") at 61:13-16. Its subsequent determination that conversion rather than dismissal was in "the best interests of creditors and the estate" acknowledged and considered ACC's recommendation in favor of conversion, *id.* at 65:22-66:1, but did not depend on or require that recommendation. *See id.* at 67:14-23. Thus ACC's standing to move to dismiss or, in the alternative, convert to Chapter 7 under section 1307(c) is not a basis for concluding that the bankruptcy court erred in converting the case to Chapter 7 and eventually denying Ms. Hardy's motion to "terminate" conversion; the bankruptcy court could have properly taken those same actions even if ACC had never filed its motion.

Second, even if the bankruptcy court's decision to convert to Chapter 7 (and its subsequent refusal not to "terminate" that conversion) required a party to seek conversion——not just dismissal——via a motion, ACC is a "party in interest" that has standing to file that motion. *See* 11 U.S.C. § 1307(c). A "party in interest" is any party "who has an actual pecuniary interest in the case" or "who has a practical stake in the outcome of a case," or "who will be impacted in any significant way in the case." *In re Sobczak*, 369 B.R. 512, 518 (B.A.P. 9th Cir. 2007). As a party holding a mortgage claim on Ms. Hardy's Pennsylvania Avenue property, ACC is a "party in interest" no matter what doctrinal formulation is used: It has "an actual pecuniary

interest" and a "practical stake" in the outcome of the case, and it would be "impacted" in a "significant way" by decisions made in the case. *See In re Reynolds*, 455 B.R. 312, 319 (D. Mass. 2011) (finding that a bank "had standing to move to convert the case as a 'party in interest' under 11 U.S.C. § 1307(c), regardless of whether it held secured or unsecured debt"); *In re Muscatello*, No. 06-11143, 2006 WL 3437469, at *3 (N.D.N.Y. Nov. 29, 2006) ("A creditor is a 'party in interest,' and as such is an appropriate party to bring a motion to dismiss or convert under § 1307(c).")

ACC's status as a "party in interest" is not diminished because Ms. Hardy has disputed its claim. Although "party in interest" is not defined in Chapter 13, courts rely on the definition of "party in interest" provided in Chapter 11 when construing Chapter 13's "party in interest" language. *See, e.g.*, *In re Armstrong*, 303 B.R. 213, 219 (B.A.P. 10th Cir. 2004) ("[d]rawing guidance from § 1109(b)"). A Chapter 11 "party in interest" includes "a creditor," 11 U.S.C. § 1109(b), and "a creditor" is statutorily defined as an "entity that has a *claim* against the debtor," *id.* § 101(10)(A) (emphasis added), and a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, *disputed*, undisputed, legal, equitable, secured, or unsecured." *Id.* § 101(5)(A) (emphasis

added). Thus, as would be the case in the Chapter 11 context, *see, e.g.*, *In re Abijoe Realty Corp.*, 943 F.2d 121, 125 (1st Cir. 1991), in the Chapter 13 context ACC is a "party in interest" even as a creditor whose claim is disputed.[5]

Ms. Hardy also argues that the bankruptcy court erred in converting her case and subsequently denying her motion to "terminate" that conversion because it did not consider her motion to convert to Chapter 11, Appellant's Merits Br. at 8; did not consider her argument, based on the ongoing litigation in the District of Columbia courts, concerning ACC's standing to file a motion under section 1307(c) such that she was denied due process, Appellant's Merits Br. at 8, 12, 18; Mot. to Take Judicial Notice, ECF No. 14 at 1-3; and did not base its conversion determination on sufficient evidence, amounting to another violation of due process. *See generally* Mot. to Take Judicial Notice. These arguments are without merit. The bankruptcy court considered and rejected Ms. Hardy's motion to

---

[5] Ms. Hardy also seems to argue that 11 U.S.C. § 303 concerning involuntary cases under Chapters 7 or 11 supports her theory that ACC lacked standing to file a motion to dismiss or convert under 11 U.S.C. § 1307(c). *See* Appellant's Merits Br. at 10-11, 14 (citing *In re Green Hills Dev. Co.*, 445 B.R. 647 (Bankr. S.D. Miss. 2011)). Section 303 specifies that only a creditor that has a claim that is "not . . . the subject of a bona fide dispute" can file a petition to commence an involuntary case. 11 U.S.C. § 303(b)(1). That requirement for an involuntary Chapter 7 or Chapter 11 case does not mean that a creditor lacks standing to file a motion to dismiss or convert a voluntary Chapter 13 case.

convert to Chapter 11. Hrg. Tr. at 64:22-65:13, 66:24-25. It also heard testimony concerning the litigation in the District of Columbia courts involving Ms. Hardy and ACC, *id.* at 30:18-22, 31:17-21, 38:17-40:15, and its conclusion that conversion to Chapter 7 was warranted was based on its reasoned assessment of what was in the best interests of creditors and the estate, *id.* at 67:14-23, and that determination, as explained above, would have been proper regardless of ACC's motion to dismiss or convert. *See id.* at 69:9-10 ("We're here for a hearing, it's the trustee's motion to dismiss."). And the court grounded its decision to convert to Chapter 7 on the evidence that had been presented to it and thoroughly explained its legal conclusions. *Id.* at 63:18-68:16.

To the extent that Ms. Hardy's "termination" motion could be construed as a motion to dismiss her Chapter 7 case under 11 U.S.C. § 707, the bankruptcy court's denial of that motion was not improper because Ms. Hardy did not make a showing of cause and did not demonstrate why a dismissal was justified. *See Terry v. Sparrow*, 328 B.R. 450, 455 (M.D.N.C. 2005).

Accordingly, Ms. Hardy does not have a strong likelihood of success on the merits of her appeal of the order denying her motion to "terminate" the conversion to Chapter 7.

## 2.   Appeal of Order Granting Turnover Motion

Ms. Hardy has also not demonstrated a strong likelihood of success on the merits of her appeal of the order granting the motion for turnover of her property on Pennsylvania Avenue. As a preliminary matter, Ms. Hardy filed no opposition to the Trustee's turnover motion in the bankruptcy court. She alleges that she did not receive notice of the turnover motion, Appellant's Mot. at 1; Appellant's Merits Br. at 16-17, but the bankruptcy court's docket shows a Notice of Motion and Opportunity to Object that was filed on August 17, 2016. Bankr. No. 16-280, ECF No. 64. That Notice states that "Bryan S. Ross, Chapter 7 Trustee for the bankruptcy estate of LaTricia L. Hardy. [sic] has filed an [sic] Motion for Turnover of Real Property/1414-1416 Pennsylvania Ave., S.E., Washington, D.C." and explains that if a written response is not filed within 21 days "the Court may deem any opposition waived, treat the motion as conceded, and issue an order granting the relief without further notice of hearing." *Id.* at 1. That Notice was mailed to Ms. Hardy. *Id.* at 2. By not asserting any arguments in opposition to the turnover motion below, Ms. Hardy has waived the arguments she musters on appeal. *Cf. District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal.").

Even if Ms. Hardy had not waived her arguments in opposition to the turnover motion, she still would not likely be successful on the merits of her appeal. The turnover provision of the Bankruptcy Code states in relevant part:

> an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a). "The first requirement of Code § 542(a) is that the property be property of the estate." *In re Weiss-Wolf, Inc.*, 60 B.R. 969, 975 (Bankr. S.D.N.Y. 1986). And "[p]roperty of the estate is defined by 11 U.S.C. § 541(a)(1) as 'all legal [or] equitable interests of the debtor in property as of the commencement of the case.'" *In re Pyatt*, 486 F.3d 423, 427 (8th Cir. 2007). "This definition of estate property is intentionally broad and will reach to bring within the estate every conceivable interest that the debtor may have in property . . . ." *In re Coomer*, 375 B.R. 800, 804 (Bankr. N.D. Ohio 2007). Under this definition, Ms. Hardy's ownership stake in the Pennsylvania Avenue commercial property appears to be "property of the estate." The other elements of a section 542(a) turnover action also appear to be satisfied. Ms. Hardy had "possession, custody, or control" of the Pennsylvania Avenue property during

15

her bankruptcy case, *see Shapiro v. Henson*, 739 F.3d 1198, 1204 (9th Cir. 2014), and the trustee may "use, sell, or lease" that property. *See* 11 U.S.C. § 542(a).

Ms. Hardy argues that turnover was improper because there is an ongoing dispute between her and ACC regarding the validity and enforceability of the mortgage encumbering the Pennsylvania Avenue property. She argues that that ongoing litigation constitutes a dispute as to the property that was the subject of the turnover action, making turnover impermissible. Appellant's Merits Br. at 10, 19 (citing 11 U.S.C. § 542(b)). But as the Chapter 7 Trustee points out, Trustee's Merits Br. at 18, a turnover proceeding is impermissible when "the amounts *owed to the Debtor* are contested." *In re N. Parent, Inc.*, 221 B.R. 609, 626 (Bankr. D. Mass. 1998) (emphasis added); *see In re National Jockey Club*, 451 B.R. 825, 830 (Bankr. N.D. Ill. 2011) ("There is a difference between property potentially *owed to* a debtor and property *owned by* the debtor.") (emphasis in original); *In re Olympia Holding Corp.*, 221 B.R. 995, 998 (Bankr. M.D. Fla. 1998) ("The turnover provision provided by § 542 applies to tangible property and money due to the debtor without dispute which are fully matured and payable on demand."). Although there appears to be a dispute about what debt Ms. Hardy owes to ACC, there is not a dispute about amounts or property owed to Ms. Hardy. And although turnover is impermissible as to assets

"whose title is in dispute," *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1472 (D.C. Cir. 1991), Ms. Hardy does not explain how the dispute between her and ACC in the District of Columbia courts puts title to the Pennsylvania Avenue property in dispute.[6] Accordingly, it does not appear that the bankruptcy court erred in ordering the turnover of her Pennsylvania Avenue property.

Ms. Hardy also argues that the bankruptcy court lacked jurisdiction to order turnover because her dispute with ACC gave rise to a "non-core" proceeding or, alternatively, because *Stern v. Marshall*, 564 U.S. 462 (2011) has called into question the jurisdiction of a bankruptcy court even as to those proceedings designated as "core" under 28 U.S.C. § 157(b)(2). *See* Appellant's Merits Br. at 20. But the first jurisdictional argument is unlikely to succeed because, given that Ms. Hardy has not explained how her dispute with ACC puts title to the Pennsylvania Avenue property in dispute, the turnover proceeding was a "core," as opposed to a "non-core," proceeding. *See In re*

---

[6] In any event, the dispute that makes turnover inappropriate must be a "*legitimate* dispute." *In re Conex Holings, LLC*, 518 B.R. 792, 801 (Bankr. D. Del. 2014) (emphasis added). Here, aside from alleging that the ongoing litigation in the District of Columbia courts gives rise to a dispute, Ms. Hardy does not explain how that dispute is a legitimate one. It appears not to be, as the Superior Court of the District of Columbia issued an Order rejecting seven distinct arguments Ms. Hardy made challenging the validity and enforceability of her loan agreement with ACC. *See* AA at 55-62.

*Soundview Elite Ltd.*, No. 14-3179, 2014 WL 2998529, at *3
(S.D.N.Y. July 3, 2014) (explaining that when "the turnover
statute is used to recover assets with disputed title when the
estate's claim of ownership is legitimately debatable," such an
action can only be understood as a "non-core rather than core
proceeding[]") (internal quotation marks omitted). And the
second jurisdictional argument is likely to fail because "the
reported post-*Stern* decisions have overwhelmingly held that
bankruptcy judges can constitutionally enter final judgments in
turnover actions." *In re Pali Holdings, Inc.*, 488 B.R. 841, 850
(Bankr. S.D.N.Y. 2013).

Accordingly, Ms. Hardy does not have a strong likelihood of
success on the merits of her appeal of the bankruptcy court's
turnover order.

**B.   Irreparable Injury**

Ms. Hardy identifies "the loss of her commercial property"
as "significant and ongoing" and "irreparable injury."
Appellant's Mot. at 2-3. ACC and the Chapter 7 Trustee counter
that Ms. Hardy will not be harmed "by the orderly liquidation of
property as required under the Bankruptcy Code." Trustee's Opp.
at 3; ACC's Opp. at 6. Although the Court is sympathetic to Ms.
Hardy's desire to retain her commercial property, she has not
explained the nature of her injury aside from calling it
"significant," "ongoing," and "irreparable." Appellant's Mot. at

18

2-3. These conclusory labels do not demonstrate irreparable injury. *See Brown v. District of Columbia*, 888 F. Supp. 2d 28, 31 (D.D.C. 2012) (explaining that in the analogous preliminary injunction context "[t]he movant . . . carries the burden of persuasion"). While being evicted from a home might amount to irreparable injury, *see Edwards v. Habib*, 366 F.2d 628, 630 (D.C. Cir. 1965) (Skelly Wright, J., concurring) ("Certainly being evicted into the street is irreparable damage."), Ms. Hardy has not explained how turnover of commercial property amounts to a similarly irreparable injury.

### C.  Substantial Harm to Other Parties

Ms. Hardy has also failed to demonstrate that other interested parties will not suffer substantial harm if injunctive relief is granted. She asserts that any injury to the Chapter 7 Trustee is outweighed by the injury she will suffer as a result of a stay not being granted. Appellant's Mot. at 3. But issuing a stay and delaying turnover potentially "harms creditors who are entitled to payment." Trustee's Opp. at 4. Thus this factor also weighs against staying the bankruptcy court's orders pending appeal.

### D.  The Public Interest

Ms. Hardy asserts that the "public interest favors a [s]tay" because she suggests that "fundamental constitutional rights" were not upheld in the bankruptcy court and because

"bankruptcy issues" were not "carefully considered." *See* Appellant's Mot. at 3. But Ms. Hardy's constitutional rights appear to have been adequately safeguarded in the bankruptcy court, *see supra* Part II.A.1 (discussing Ms. Hardy's due process allegations), and the issues of bankruptcy law were carefully considered. Ms. Hardy thus has not shown that the public interest in this case favors a stay pending appeal.

## III. Conclusion

Because Ms. Hardy has not carried her burden of showing that "all four factors, taken together, weigh in favor" of a stay, *see Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009), the Court **DENIES** her motion for a stay. An appropriate Order accompanies this Memorandum Opinion.

   **SO ORDERED.**

**Signed:     Emmet G. Sullivan**
**          United States District Judge**
**          December 29, 2016**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LATRICIA LEE HARDY,              )
                                 )
          Debtor,                )    BP No. 16-280
                                 )
                                 )    Washington, D.C.
          vs.                    )    July 15, 2016
                                 )    10:11 a.m.
BRYAN S. ROSS, ET AL.,           )
                                 )
          Trustees.              )
_____)


TRANSCRIPT OF MOTION TO CONVERT CASE
BEFORE THE S. MARTIN TEEL, JR.
UNITED STATES DISTRICT BANKRUPTCY JUDGE


APPEARANCES:

For the Debtor:              Latricia Lee Hardy, Pro Se
                             1006 15th Street, SE
                             Washington, D.C. 20003
                             (202) 546-3198


For All Credit Considered
Mortgage, Incorporated:      Michael Ostroff



                             Cynthia Niklas



Court Reporter:              William P. Zaremba, RMR, CRR
                             Official Court Reporter
                             U.S. Courthouse
                             333 Constitution Avenue, NW
                             Room 6511
                             Washington, D.C. 20001
                             (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

<pre>
 1                    P R O C E E D I N G S
 2           THE COURT:  Call the next case, please.
 3           DEPUTY CLERK:  The next case on the calendar is
 4   16-280, Latricia Hardy.
 5           The matter before the Court are motion to dismiss
 6   case with prejudice filed by Cynthia Niklas, and a motion to
 7   convert case to Chapter 11 filed by Latricia Hardy.
 8           Will the parties please come forward and state
 9   your name for appearance.
10           MS. HARDY:  Latricia Hardy, debtor.
11           MR. OSTROFF:  Good morning, Your Honor.
12   Michael Ostroff on behalf of All Credit Considered Mortgage,
13   Incorporated.  We're a secured creditor in this case.
14           We've also filed an opposition to the motion to
15   convert to Chapter 11, as well as a motion to dismiss with
16   prejudice or convert.
17           I note that's not on the docket today; however,
18   debtor has filed an answer to that, to the extent Your Honor
19   is willing to hear information related to that as well.
20           (Pause)
21           MS. NIKLAS:  This case is set only for
22   confirmation hearing, although -- and motion to dismiss.
23           THE COURT:  I think that's only for a hearing on a
24   motion to convert as well.
25           Just a moment.
</pre>

1         This is on a motion to convert to 11.

2         And trustees filed a motion.

3         MS. NIKLAS:  Yeah.  My motion is to dismiss the

4    case.  The debtor filed a motion to convert to Chapter 11,

5    and the creditor filed a motion to convert to Chapter 7.

6         The problem here is that the -- there's been no

7    341 meeting.  The debtor did not appear at the rescheduled

8    meeting after -- at the original meeting of creditors on

9    July 11.

10        And her Schedules show that she is ineligible for

11   Chapter 13 relief or any relief.  She has scheduled income

12   of zero, expenses of zero, and disposable of zero.  She's

13   made no plan payments, and I'm requesting that the case be

14   dismissed.

15        I have little information about the debtor,

16   because she did not appear at the meeting of creditors this

17   Monday.

18        THE COURT:  Mr. Ostroff.

19        MR. OSTROFF:  Good afternoon, Your Honor.

20        Our firm and our client concur with the trustee's

21   motion to dismiss, to the extent that there's a dismissal.

22   And if there is a conversion, we'd like to see a conversion

23   to Chapter 7, not Chapter 11.

24        So trustees pointed, but the Schedules clearly

25   indicate, or, as presented to the Court, indicate that there

1 is absolutely no income, there is only one debt listed on

2 the Schedules, and that's the ACC Mortgage.  It's a mortgage

3 claim on a property that the debtor did not disclose any

4 interest in.  She listed two properties on Schedule A/B

5 Part 1; one on 15th Street -- and let me make sure it's

6 Street, not Avenue -- 15th Street, Southeast; and one on

7 Q Street, Southwest.

8          The property in question is on Pennsylvania

9 Avenue, is a commercial property and is subject to the

10 mortgage.  That property, however, is not disclosed anywhere

11 on her Schedules, other than being the place of business for

12 an LLC she listed.

13          In addition to that, on information and belief,

14 the debtor owns two or three additional properties in which

15 her name is on title, which are not listed in the Schedules.

16          It is hard to believe that debtor has no other

17 creditors, but she was not at our meeting of creditors, she

18 has listed no other creditors in her Schedules.

19          I note she filed for installments of the filing

20 fee.  She did make that payment eventually.  And then she

21 did file the fee for a motion to convert; however, she's

22 demonstrated no ability to sustain any plan of

23 reorganization, whether or not under Chapter 13 or 11.

24          I note that her Chapter 13 plan stated that it

25 would pay all 1322(b)(5) claims in full, proposing over a

1   $5,000 a month payment, while maintaining direct payments to

2   the mortgage -- well, direct payments to secure creditors.

3          She has not made any payment to her secured

4   creditor as of this date.  Additionally, the debtor has not,

5   to our motion -- which, again, was not listed as being here

6   but there was no response filed -- the debtor did not

7   address any of these concerns.  The debtor did not address

8   any of the income concerns, any of the lack of information

9   in her Schedules pertaining to these other properties; the

10  fact that there's a co-debtor involved in this bankruptcy.

11  She did not address any of that.  Instead, she focused on

12  the viability on an underlying Superior Court case, which

13  has already been decided in favor of ACC Mortgage and which

14  she appealed; however, that's stayed pending this

15  bankruptcy.

16         She went to the heart of whether a motion to

17  dismiss was cognizable.  But all of her references refer to

18  the D.C. Superior Court case, not this bankruptcy matter.

19         Additionally, she argues that there's no bad

20  faith, simply because she thought she could get relief in

21  Chapter 13, and now her understanding is that she can --

22  that Chapter 11 is for commercial businesses so she's

23  allowed to do that.

24         She made no reference to gross revenues, net

25  revenues.  No reference to how this business operates.

1   As far as we know from the Statement of Financial Affairs,

2   the only business she owns is a beauty parlor held in an

3   LLC, but that's not the owner of the commercial property.

4          So if she's contending that she owns the

5   commercial property as well as the commercial business, she

6   has multiple commercial ventures which are not disclosed and

7   not discussed.

8          I, as part of this proffer, think, on its face,

9   debtor filing these Schedules and these statements under the

10  penalty of perjury and not taking any action to amend these

11  documents after our motion was filed and our opposition was

12  filed, is clearly bad faith.  She is not looking to

13  re-organize this debt.  She was looking to stay a

14  foreclosure and sale of her property, which has already been

15  litigated in the D.C. Superior Court.

16         Unless Your Honor has any questions for me, I will

17  reserve on questions for the debtor later.

18         THE COURT:  Ms. Hardy, I'll hear from you.

19         MS. HARDY:  Thank you.

20         Good morning, Judge.

21         I agree that -- partly what he says, because when

22  I filed the Chapter 13, I unknowingly knew exactly what to

23  do and what to put on the papers.  So that's why I came here

24  to seek legal advice here at the Bankruptcy Court.  And at

25  that time, I had decided to do the Chapter 11, because 13

1  was under -- was putting it under the business, but the

2  business didn't own anything.  So he said I need to put it

3  under my name personally and the property and file for

4  Chapter 11 -- would be more sufficient for the commercial

5  property.

6            And I apologize to the Court and Ms. Niklas for

7  any confusion that I may have occurred -- concurred.

8            THE COURT:  Ms. Hardy, thank you very much.

9            MS. HARDY:  Excuse me?

10           THE COURT:  Thank you very much.

11           MS. HARDY:  Okay.

12           THE COURT:  Ms. Niklas, do you want to put on a

13  case so we have an evidentiary record?

14           MS. NIKLAS:  Yes.  Thank you.  I would like to

15  call the debtor to the stand.

16           THE COURT:  Miss, please.

17           DEPUTY CLERK:  Please raise your right hand.

18           (Witness is placed under oath.)

19           DEPUTY CLERK:  Please have a seat and state your

20  name for me.

21           THE WITNESS:  Latricia Hardy.

22                          - - -

23  LATRICIA HARDY, WITNESS FOR THE DEBTOR, SWORN

24                    DIRECT EXAMINATION

25                          - - -

1    BY MS. NIKLAS:

2        Q    What is you address, please?

3        A    1006 15th Street, Southeast, Washington, D.C.,

4    20003.

5        Q    How long have you lived there?

6        A    Over 20 years.

7        Q    Have you lived there continuously for the last

8    three years?

9        A    Yes.

10       Q    How many people live there with you?

11       A    Three.  Well, three altogether.

12       Q    Three?

13       A    Yeah.

14       Q    And who are they?

15       A    My granddaughter and my son.

16       Q    How many -- two sons?

17       A    One son.

18       Q    So one son.

19            Are you married?

20       A    I'm widowed.

21       Q    Have you filed a bankruptcy case before?

22       A    No.

23       Q    Did you file your tax returns for 2015?

24       A    Yes.

25       Q    Federal and State?

```
 1       A    Yes.

 2       Q    Did you file timely or late?

 3       A    Timely.

 4       Q    What about 2014?

 5       A    Correct.  Yes.

 6       Q    '13 and '12?

 7       A    Yes.

 8       Q    Have you turned over those tax returns to my

 9  office?

10       A    No, I didn't.

11       Q    Where do you work?

12       A    Capitol Hill Beauty Salon.

13       Q    Are you self-employed?

14       A    Yes.

15       Q    Do you earn any income from that job?

16       A    Yes, I do.

17       Q    Did you schedule that income on your Schedules?

18       A    No, because currently I haven't been as -- not

19  active right now.

20            But, no, I didn't.  I didn't complete the whole

21  form, no, I didn't.

22       Q    Who filed your Schedules for you?

23       A    I did by myself.

24       Q    Who helped you in filing this case?

25       A    I did.
```

1    Q    Nobody helped you?

2    A    No.

3    Q    Where did you get the idea?

4    A    Of what?

5    Q    Of filing a Chapter 13?

6    A    Just talking to some friends or whatever, and they

7    said 13 would save the property.

8         But after me researching -- because everything

9    came sort of fast and I really had no time to do a diligent

10   research.  So after talking with the attorneys here, I see

11   that I should have filed it Chapter 11.  At that time, I

12   asked to convert.

13   Q    You talked to attorneys here?

14   A    Yes.

15   Q    And who did you talk to?

16   A    At the bankruptcy, legal advice downstairs.

17   Q    Did you report any income in 2015 on your taxes?

18   A    On my taxes?  Yes.

19   Q    What was the income, your adjusted gross income?

20   A    It was around 20-.

21   Q    20- --

22   A    20,000.

23   Q    Do you have any people working for you?

24   A    I have space rented out.

25   Q    Do you keep records of your income and your

1  expenses?

2       A    Yes.

3       Q    Did you receive a refund in 2015?

4       A    Yes.

5       Q    And how much of a tax refund did you receive from

6  IRS?

7       A    I think it was 3 -- 3,900.

8       Q    And what about from D.C. Government?

9       A    I can't say right off, but maybe 1,800, something

10  like that.

11      Q    So 20,000 is what you earned last year?

12      A    Under the LLC.  But I do have income coming from a

13  couple other properties, yeah.

14      Q    Okay.  So let's start with your income from

15  20,000.  Your Schedules ask you to state what your income is

16  from your business.  That would be around 16- or 1,700 a

17  month; is that right?

18      A    I get --

19      Q    If that's your income?

20      A    16- or 1,700 a month?

21      Q    Okay.

22      A    Yeah, something like that.

23      Q    Did you handwrite your Schedules on Schedule I --

24      A    Yes.

25      Q    -- that says what your income is?

1          And you say "employed" or "not employed."

2    Do you remember what you filed?

3         A     I might have put zero, because at the time,

4    I haven't been doing anything.  I didn't know if you needed

5    it right then or from prior.

6         Q     So if you schedule -- you crossed off the box that

7    says you're unemployed; is that true?

8         A     I haven't been working, but I am -- I have the

9    business, but it hasn't been active.

10        Q     Do you have an occupation?

11        A     No.  I just run the business.  I don't do hair

12   myself.

13             THE COURT:  How long has the business not been

14   active?

15             THE WITNESS:  It's just for a couple of months.

16   It just -- it's sort of, you know, vacant, the building is

17   vacant.  I just have -- I do have an employee or two working

18   there.  Not employee, but a self-employee, who rents space

19   there.

20             THE COURT:  And who are they?

21             THE WITNESS:  Who are that?

22             THE COURT:  Yes.

23             THE WITNESS:  Ms. Sadies [phonetic], Ms. Gracias.

24             THE COURT:  And how much does she pay you?

25             THE WITNESS:  It's 250 a week.

```
 1              THE COURT:  $250 a week?

 2              THE WITNESS:  Yes.

 3   BY MS. HARDY:

 4        Q    You filed this case on May 31?

 5        A    Yeah.

 6        Q    On May 31, was your business in operation?

 7        A    It was like what I just told the Judge, just one

 8   employee at that time.

 9        Q    One employee paying you rent only?

10        A    Yeah.

11        Q    At 250 a week?

12        A    Yes.

13        Q    Okay.  There's a section on the Schedules --

14              THE COURT:  You say she's an employee but you --

15              THE WITNESS:  Well, not employee, a self-employed.

16              THE COURT:  And she --

17              THE WITNESS:  She pays rent.

18              THE COURT:  -- she pays rent to you for the space?

19              THE WITNESS:  Yes.

20   BY MS. NIKLAS:

21        Q    What does the person do, does she cut hair?

22        A    Yes.  She works on hair.

23        Q    Does she have customers?

24        A    Yes.

25        Q    Does she pay you a percent of what she earns, in
```

1  addition to the rent?

2        A    No.

3        Q    So there's no other fee that you get from this

4  person except rent?

5        A    That's all I get from her, yes.

6        Q    And how long has she been paying you rent?

7        A    Oh, for five-years-plus.

8        Q    And so on Schedule I, it asked if you have rental

9  income, and you put zero -- you put nothing.  Is there a

10  reason why you didn't report the rental income?

11       A    Well, at the time -- okay.  I do agree everything

12  wasn't complete.  I was hoping to maybe see someone to make

13  sure of what all to put exactly.  So that was my reasoning

14  for not completing it fully.  But not deceiving, but,

15  you know, like I didn't know exactly what to do.  So that's

16  why I came in to see the bankruptcy attorney and have been

17  seeing him since every two weeks.

18       Q    Has this bankruptcy attorney suggested that you

19  amend your schedules?

20       A    Well, yes, after I convert.

21       Q    After you convert?

22       A    Yes.

23       Q    In addition to the rental income of 250 from the

24  business, do you receive income from any other source?

25       A    Other properties.

1          I'm looking for income to come in for the salon,

2    but I have prospered -- people coming in to rent.

3          Q    When you filed your case on May 31, did you

4    have -- already have income coming from any other source?

5          A    Yes.

6          Q    How much did you -- how much have you been

7    receiving as of May 31?

8          A    For -- it's another property that I get 1,800 a

9    month from.

10         Q    1,800.  And where is that property located?

11         A    It's 90 Q Street.

12         Q    90 Q Street?

13         A    Yes.  Southwest.

14         Q    Who lives there?

15         A    My son.

16         Q    How old is he?

17         A    22.

18         Q    Does he have a job?

19         A    25.  I'm sorry.

20         Q    Does he have a job?

21         A    Yes.

22         Q    Where does he work?

23         A    Well, he just changed jobs.  I'm not sure what job

24    it is.  But his girlfriend's the one who the rent come from.

25         Q    And is the rent current?

```
1         A     Yes, it is.

2         Q     So you receive 1,800 from your son and girlfriend,

3   in addition to the 250?

4         A     Yes.

5         Q     What other income do you receive?

6         A     It's 500 from both condos.

7         Q     From two condos?

8         A     Yes.

9               THE COURT:  And where are those located?

10              THE WITNESS:  In Maryland.

11              THE COURT:  What are the addresses?

12              THE WITNESS:  5211 Newton Street.

13  BY MS. NIKLAS:

14        Q     Can you repeat that?

15        A     5211 Newton Street, Bladensburg, Maryland, and

16  3107 Good Hope Avenue, Temple Hills, Maryland.

17        Q     Is the -- how much is the rent from each one?

18        A     500.

19        Q     Is it 500 each --

20        A     Yes.  Each.

21        Q     -- or together?

22              So it's a thousand total?

23        A     Total, yes.

24        Q     Okay.  What other rental income do you receive?

25        A     That's it for right now, but I'm looking for more
```

1    to come in.

2        Q    Do you receive any disability or any part-time --

3        A    I don't.

4        Q    -- income or income from anybody else?

5        A    No.

6        Q    Does anybody owe you any money?

7        A    No.  Not exactly.

8        Q    The property on 15th Street, when did you buy it?

9        A    I've been there for over 20 years.  I don't know.

10   It was my husband's, him and I.

11       Q    Are you the sole owner?

12       A    Yes.  I am now.

13       Q    Is there a mortgage?

14       A    Yes, it was a mortgage.  Well, his father was

15   taking care of that since he's deceased.

16       Q    What are the monthly mortgage payments?

17            THE COURT:  Let her finish the answer.

18            Your father?

19            THE WITNESS:  His father was taking care of the

20   mortgage.

21            THE COURT:  Your deceased husband's father was

22   taking care of it?

23            THE WITNESS:  Yes.

24            THE COURT:  Is it still owing?

25            THE WITNESS:  Yes, it is.

1        THE COURT:  And is the father still taking care of

2    it?

3        THE WITNESS:  Well, he's deceased now also.

4        THE COURT:  So who's taking care of the mortgage?

5        THE WITNESS:  I don't know if it's paid off or if

6    it's still a pending mortgage.  I have to look into that.

7        THE COURT:  Who's the mortgagee?

8        THE WITNESS:  American Servicing Center.

9        THE COURT:  Go ahead, Ms. Niklas.

10   BY MS. NIKLAS:

11       Q    You scheduled ACC Mortgage with a $303,000 claim.

12   Is that the mortgage company?

13       A    That's the mortgage company, yes.

14       Q    On 15th Street?

15       A    No.  On 1414 Pennsylvania Avenue, on the

16   commercial property.

17       Q    That's where the beauty shop is?

18       A    Yes.

19       Q    And what are the monthly payments to ACC Mortgage?

20       A    He had down 2,400.

21       Q    A month?

22       A    Yes.

23       Q    How many months were you behind on May 31 when you

24   filed the case?

25       A    The total amount I guess what they have 303- total

```
 1   amount, because there hadn't been a payment because they

 2   took me to court right after the mortgage was consummated,

 3   because they didn't have a power of attorney.  So the

 4   payments that I did send them, they sent back, and they

 5   proceeded with a court hearing to --

 6             THE COURT:  You say 303-.  What does that mean,

 7   303,000?

 8             THE WITNESS:  Thousand.  It was 276-, but I guess

 9   they adding interest in ever since the mortgage.

10   BY MS. NIKLAS:

11        Q    Ms. Hardy, you scheduled that debtor's 330,000.

12   Is that the arrears to the mortgage company or the whole

13   debt?

14        A    The whole debt.

15        Q    What are the arrears amount, do you know?

16        A    I don't know.

17        Q    How many months were you behind when you filed

18   this case?

19        A    I mean, there --

20        Q    When's the last time you made a payment?

21        A    I haven't made a payment.  Well, the payment I

22   made, they sent back.  So it was at the beginning of the

23   loan.

24        Q    So you don't know how much the arrears would be?

25        A    No.
```

1      Q    Can you estimate, a couple hundred thousand?

2      A    No, it's not that much.  The arrears maybe about

3  70,000.

4      Q    70-, you think?

5      A    Yeah.

6      Q    Is there a second mortgage on that -- on your

7  beauty shop?

8      A    No.

9      Q    Is there a condominium fee or an HO fee?

10     A    No.

11     Q    A tax lien or a judgment lien?

12     A    Not yet.

13     Q    Not yet?

14     A    Yeah.

15     Q    You scheduled your address as 15th Street.  Do you

16  owe that too?

17     A    Yeah.  That's where I live.

18     Q    Did you buy that property?

19     A    Yes.

20     Q    You own that?

21     A    Yes.

22     Q    And is there a mortgage on that property?

23     A    It is a mortgage, I suspect.  It's still a more --

24  that was the mortgage that was in my husband's name.

25     Q    What's the mortgage company's name?

1       A    American Servicing Center.

2       Q    Did you schedule that creditor on your papers, on

3  your schedules?

4       A    No.

5       Q    Because why?

6       A    I only did ACC Mortgage.

7       Q    I see.

8            So on your principal residence, you have a

9  mortgage by American Servicing?

10      A    Yes.

11      Q    What is the total debt?

12      A    I don't know.  I have to get that to you.

13      Q    Is it a couple hundred thousand?

14      A    It wouldn't be over 100-.

15      Q    Are there monthly payments that are due?

16      A    I don't know.

17      Q    You don't know?

18      A    No.

19      Q    Who's making -- is anybody making payments to

20  American Servicing on your principal residence?

21      A    His father was, but he's now deceased.

22      Q    So you're not making the payments?

23      A    No.

24      Q    Is there a second mortgage on 15th Street?

25      A    No.

1      Q     Is there a homeowner's or condo fee --

2      A     No.

3      Q     -- tax lien, judgment lien --

4      A     No.

5      Q     -- on 15th Street?

6      A     No.

7      Q     And you own property on 90 Q Street, which you

8   scheduled?

9      A     Yes.

10     Q     Is there a mortgage on that property?

11     A     No.

12     Q     There's no debt at all?

13     A     Well, there's a mortgage, yeah, but -- it is a

14   mortgage.

15     Q     There is?

16     A     Yeah.

17     Q     And who's the mortgage company on 90 Q Street?

18     A     It's Dan Caplan, Daniel Caplan.

19     Q     Can you spell that?

20     A     D-a-n-i-e-l.  Caplan, C-a-p-l-, I think it's a-n.

21     Q     Is he the prior owner?

22     A     Yes.

23     Q     How much do you owe Daniel Caplan if you pay him

24   in full?

25     A     180,000.

1      Q    Are you making payments -- are you supposed to

2   make payments on a monthly basis to Daniel Caplan?

3      A    No, it's no monthly payments at this time.

4      Q    Did you schedule this creditor?

5      A    No.

6      Q    Is there a second mortgage on 90 Q Street?

7      A    No.

8      Q    A homeowner's fee, condo fee, tax lien or judgment

9   lien?

10     A    No.

11     Q    Nothing?

12     A    No.

13     Q    And you don't make the payments because why?

14     A    Well, that one's in court also.

15     Q    In Superior Court?

16     A    Yes.

17     Q    There's a different lawsuit than the one you

18  scheduled?

19     A    Yes.

20     Q    Are you the sole owner of 90 Q Street?

21     A    Yes.

22     Q    This is where your son lives?

23     A    Yes.

24     Q    And you own property, a condo in Newton Street?

25     A    Yes.

1    Q    Are you the sole owner of that condo?

2    A    Yes.

3    Q    Is there a mortgage on that condo?

4    A    No.

5    Q    Who bought that condo?

6    A    I did.

7    Q    Did you pay cash?

8    A    No.  I had a loan on it.

9    Q    You had a loan with who?

10   A    It was -- I think the last one was with ACC

11   Mortgage.

12   Q    And how much do you owe ACC Mortgage, if at all,

13   in regard to this condo on Newton Street?

14   A    I owe them nothing.

15   Q    Pardon me?  You owe nothing?

16   A    Nothing.  Zero.

17   Q    Was it paid in full at some point?

18   A    Yes.

19   Q    What is the value of that condo?

20   A    About 100,000.

21   Q    Do you remember what you paid for it when you

22   bought it?

23   A    About 28,000, 30,000.

24   Q    Is there a condo fee?

25   A    Excuse me?

1      Q      Is there a condo fee?

2      A      Condo fee, yes.

3      Q      And who's the condo fee company?

4      A      Bladensburg Woods Condominiums [phonetic].

5      Q      What are the condo fees per month?

6      A      $250.

7      Q      Are they current when you filed your case?

8      A      No, they're not current, but...

9      Q      How many months were you behind to the condo

10     company?

11     A      It's about a year.

12     Q      Did you schedule Bladensburg condo company?

13     A      Did I schedule them?

14     Q      That creditor, yes?

15     A      No, I didn't.

16     Q      Did you schedule Newton Street, the property?

17     A      No.

18     Q      You also have property on Good Hope Avenue?

19     A      Yes.

20     Q      Is that also in Maryland?

21     A      Yes.

22     Q      Is that -- are you the sole owner?

23     A      Yes.

24     Q      When did you buy that?

25     A      Over ten years ago.

```
 1      Q    Do you remember what you paid for it?

 2      A    Around 20-.

 3      Q    20,000?

 4      A    20,000.  Yeah.

 5      Q    What's the value today?

 6      A    It's not that much.  Maybe 50-.

 7      Q    It's what?

 8      A    Maybe 50,000.

 9      Q    Is there a mortgage on that condo?

10      A    No.

11      Q    Is there a condo fee on that condo?

12      A    Yes.

13      Q    And who's that?

14      A    Lynnhill Condominiums.

15      Q    Lincoln?

16      A    Lynnhill Condominiums.

17      Q    Lynnhill?

18      A    Yes.

19      Q    And what are the condo fees on Good Hope Avenue?

20      A    About 480.

21      Q    480?

22      A    Uh-huh.

23           THE COURT:  Per month?

24           THE WITNESS:  Per month, yes.

25 BY MS. NIKLAS:
```

1     Q   Were you current on May 31 when you filed this

2  case to the condo company on Good Hope Avenue?

3     A   No.

4     Q   How many months were you behind on that condo

5  company?

6     A   It's -- over a year.

7     Q   Did you schedule the condo company?

8     A   No, I didn't.

9     Q   Did you schedule your ownership interest in Good

10  Hope Avenue?

11     A   No, I didn't.

12     Q   Do you own any other property --

13     A   No.

14     Q   -- anywhere?

15     A   No.

16     Q   Have you sold or transferred ownership to any

17  property anywhere?

18     A   No.

19     Q   Do you owe anybody else any money other than the

20  ones we talked about today, such as credit cards, department

21  stores, friends, relatives, doctors?

22     A   Yes.

23     Q   About approximately how much?

24     A   Maybe 50,000.

25     Q   How many creditors do you owe money to?

1      A      Maybe six, seven.

2      Q      And who are the largest, can you tell me who they

3  are and the amount you owe?

4      A      Discover Card.

5      Q      How much?

6      A      I owe them about 9,000.

7      Q      Go ahead.

8      A      9,000.

9      Q      9,000?

10     A      Yes.

11     Q      What's the next one?

12     A      Pentagon -- Penn Fed, about 9,000.

13     Q      Who's this?

14     A      Penn Fed Credit Union.

15     Q      Penn Fed?

16     A      Yeah.

17     Q      Who else?

18     A      Navy Federal.

19     Q      How much?

20     A      It's about 10,000.

21     Q      Okay.  Who else?

22     A      Citibank about 5000.

23            Bankruptcy...

24            I have a credit card with Penn Fed, about 3,000.

25            And just some smaller ones.  Maybe Sears, 400.

1  And that's all I can think of.

2      Q    Did you tell the attorney that you spoke to that

3  you have all those other creditors?

4      A    No.

5      Q    Did the attorney ask?

6      A    Well, he said if -- whatever credit -- whatever

7  other creditors I have, I probably just need to include them

8  also at the conversion.

9      Q    Did you schedule any of these creditors, Discover,

10  Penn Fed, Navy FCU, Citibank or Sears?

11     A    Did I schedule?

12     Q    Schedule them?

13     A    On the docket?

14     Q    On the case you filed?

15     A    No, I didn't.

16     Q    Because why?

17     A    Because I thought I was just supposed to schedule

18  the one that I was in -- you know, trying to stop

19  foreclosure for.

20     Q    And who told you that?

21     A    Well, that's what I just assumed.

22          I just had friends tell me, like it wasn't legal

23  advice.  That's why I came in for legal advice.

24     Q    When you saw my motion to dismiss, did you think

25  at any point that you should amend the schedules or talk to

1   an attorney?

2      A   Well, I had already talked to an attorney after I

3   put in for the 13.  It was shortly after.  And then that's

4   when I converted, after talking with the attorney.

5      Q   Your plan says you had to pay 5,400 a month.

6   That's to pay what?

7      A   Well, that was a misunderstanding of that.

8         I thought -- because it says you had five years to

9   pay it.  So I was putting in, divide in what was owed to

10  them to get that amount of 5,000 would equal up to the total

11  amount that was owed to ACC Mortgage.

12     Q   So you want to pay ACC Mortgage in full?

13     A   Well, it's -- I thought 13 would give you only

14  five years to pay them.  So that's how I just calculated it.

15  Not saying it was right to do it that way.

16     Q   And did you make any plan payments?

17     A   No.

18     Q   Are you involved in a lawsuit where people owe you

19  money?  Are you making a claim against anyone?

20     A   Yes.

21     Q   Who?

22     A   ACC Mortgage.

23     Q   Anybody else?

24     A   Yeah.  To Dan Caplan.

25     Q   Dan Caplan owes you money?

```
 1            THE COURT:  "Caplan."

 2  BY MS. NIKLAS:

 3       Q    Caplan owes you money?

 4       A    Yes.

 5       Q    How much?

 6       A    Whatever the Court decides.  I have a discrepancy

 7  on -- it was like a predatory loan so...

 8       Q    Are these counterclaims in Superior Court?  Did

 9  they sue you first and you counterclaimed -- or you sued

10  them?

11       A    Well, ACC is --

12       Q    Okay.

13       A    -- they sued first.

14       Q    Do you have an attorney?

15            THE COURT:  Let her answer the question,

16  Ms. Niklas.

17            THE WITNESS:  ACC sued first.  So then I put in a

18  counterclaim for an item, for the Certificate of Service

19  that I had never received.  That was -- not a counterclaim,

20  but that was a different suit.  But I had -- was disputing

21  their claim in court.

22  BY MS. NIKLAS:

23       Q    How much does ACC owe you, in your opinion?

24       A    Well, in my suit, it's about $25,000.

25            THE COURT:  If the Superior Court ruled against
```

1    you, correct?

2            THE WITNESS:  No.  Not that.  Huh-uh.  They

3    haven't ruled at all yet.

4    BY MS. NIKLAS:

5        Q    Now, in the suit involving Daniel Caplan --

6        A    Yes.

7        Q    -- did you sue him or did he sue you first?

8        A    I sued him first.

9        Q    For what amount of money?

10       A    For release of the lien for -- I didn't really put

11   an amount, just a release of the lien, and whatever the

12   Court decides.

13       Q    What is the status of that case?

14       A    It's in Court of Appeals.

15       Q    Did you lose?

16       A    When I went back -- when the first -- the case was

17   first heard, it was at the Court of Appeals.  And they sent

18   it back; they remand it back.  And then the Judge denied it

19   again so I sent it back to the Court of Appeals.

20       Q    Do you have an attorney in Superior Court

21   representing you in either of these suits?

22       A    No.

23       Q    Why won't Daniel Caplan release the lien?

24       A    I guess he assumed he's right, and I assume I'm

25   right.

```
 1        Q     So you filed this case just to effect the rights
 2   of ACC Mortgage because of the Superior Court case;
 3   is that right?
 4        A     Could you repeat that.
 5        Q     You filed this case just to address your issues
 6   with ACC Mortgage; is that right?
 7        A     You're speaking of the case with ACC Mortgage?
 8        Q     Well, this current Chapter 13 case.
 9        A     You said I filed it to?
10        Q     Why did you file this case?
11        A     To stop foreclosure.
12        Q     From who?
13        A     ACC Mortgage, to save my property.
14        Q     And that's why you didn't bother filling in
15   anything else --
16        A     It was mainly for that.  Yes.
17        Q     -- because it didn't matter to you?
18              MS. HARDY:  No further questions.  Thank you.
19              THE WITNESS:  Thank you.  Cross-examination.
20                        -  -  -
21                      CROSS-EXAMINATION
22   BY MR. OSTROFF:
23        Q     Good morning, Ms. Hardy.
24        A     Good morning.
25        Q     Stepping back a second, what's the highest level
```

1   of education you've received?

2       A    12th.

3       Q    12th grade?

4       A    Yes.

5       Q    Did you take any post high school courses?

6       A    Post?

7       Q    Post high school coursework?  Any professional,

8   any licensing, any -- you're a hair dresser.  I assume you

9   took licensing courses?

10      A    No.

11      Q    Okay.

12      A    I'm not a hairdresser.  I just -- my mother -- and

13  the shop is the beauty salon.  So I mean, I just run the

14  salon.

15      Q    Who owns Capitol Hill Beauty, LLC?

16      A    I do.

17      Q    You're 100 percent owner?

18      A    Well, 99 percent.

19      Q    Who's the other 1 percent?

20      A    It's Patricia White.

21      Q    And that's your mother?

22      A    Yes.

23      Q    Okay.  How do you file taxes?  Do you file

24  separate corporate taxes or do you do a pass-through at

25  taxing?

1          Do you report your business income on your taxes

2    or do you pay --

3        A    Well, really the business was up under the

4    Capitol Hill, and it went under my mother's taxes.

5        Q    Okay.

6        A    So the Capitol Hill, LLC, is sort of adornment,

7    even though it was registered and is -- you know,

8    registered, but it's not -- haven't really filed taxes for

9    the LLC.

10       Q    Okay.  When you said you had $20,000 of income you

11   reported last year, where did that income come from?

12       A    That was from the beauty salon, the Capitol Hill.

13       Q    Okay.  Did that come from your renters directly to

14   you --

15       A    Right.

16       Q    -- or was that deposited into the LLC?

17       A    Directly to me.

18       Q    And what did -- to your knowledge as a business

19   owner, how much money did your mother make from Capitol Hill

20   Beauty, LLC, in 2015?

21       A    She made none.

22       Q    Now, you've listed a number of -- today, you've

23   talked about a number of sources of income --

24       A    Yes.

25       Q    -- from different rents, rents coming to the

1    commercial property on Pennsylvania Avenue, to Q Street, to

2    Newton, to Good Hope.

3            But if I recall, you stated you've not made

4    payments on any mortgages or condo associations within the

5    last year; is that correct?

6        A    That's correct.

7        Q    How much money do you have in your bank account

8    right now?

9        A    Maybe $500.

10       Q    Can you list your ten biggest monthly expenses

11   that you actually pay?

12       A    How much?

13       Q    Yeah.  What they are, and give me an idea of what

14   you're paying.

15       A    I think it's Penn Fed, amount $600; Navy Federal,

16   about that amount, around 6-.

17       Q    Household expenditures?  Food?  Utilities?  Are

18   you current on your utilities?

19       A    Yes.

20       Q    Okay.  How much would you say your utilities are

21   each month?

22       A    About less than 200.

23       Q    How do you get to work?

24       A    I have a vehicle, but it's not in emission [sic]

25   right now.  I mean, it's my brother's car.  Or I can just

1    walk up the street.

2        Q    The vehicle that you own is the Nissan Frontier?

3        A    Yes.

4        Q    Is that the only vehicle with your name and title?

5        A    Yes.

6        Q    Do you owe anybody any money for that vehicle?

7        A    Yes.  That's what Penn Fed is under.

8        Q    Okay.  So that's secured by Penn Fed?

9        A    Yes.

10       Q    And the monthly mortgage -- sorry.  The monthly

11   vehicle payment, is that the $600?

12       A    No.  That one's the 300.

13       Q    Okay.

14       A    3 -- maybe around 300.

15            THE COURT:  What's the 600 per month for?

16            THE WITNESS:  That's a personal loan.

17   BY MR. OSTROFF:

18       Q    Are you current on your --

19            THE COURT:  Just a minute.

20            Is that personal loan secured by a lien on your

21   real property?

22            THE WITNESS:  No.  No liens on that.

23   BY MR. OSTROFF:

24       Q    Is it -- to follow up with the Judge's question,

25   is it possibly secured by the value of your vehicle as well?

```
1        A    Yes.

2        Q    Are you current with your vehicle payment?

3        A    Yes.

4        Q    And I'm sorry.  You said there was some issues

5   with it?

6        A    Yeah.

7        Q    What kind of issues?

8        A    I need a supercharge.

9        Q    What is your intention with your vehicle?  Are you

10  going to keep it?  Are you going to surrender it?

11       A    Yes, I'm going to keep it.

12       Q    How much do you believe -- how much work

13  do you believe needs to be put into it to make it run

14  properly?

15       A    I don't know.  I have to have someone look at it.

16  I haven't had a chance yet.

17       Q    To clarify for the record, you said the Court

18  hasn't made a decision in the ACC matter; is that true?

19       A    Yeah.  I said the Court of Appeals hadn't made a

20  decision.

21       Q    There are actually two court cases --

22       A    Yeah, it's two.

23       Q    -- with ACC, correct?

24       A    Uh-huh.

25       Q    One, ACC sued you?
```

1        A     Yes.

2        Q     And there was a decision by the Superior Court in

3   favor of ACC Mortgage, correct?

4        A     That's correct, but --

5        Q     And you appealed that?

6        A     That's the decision I appealed, but also the

7   Judge DeMayos [phonetic] had sent a letter stating that it's

8   no -- that the judgment is not a final judgment on -- with

9   Judge Nashgate [phonetic].

10       Q     And the second ACC lawsuit, that's the one where

11  you're suing ACC?

12       A     Yes.

13       Q     And what's the basis of that claim?

14       A     Certificate of Satisfaction.

15       Q     And you're looking for a Certificate of

16  Satisfaction?

17       A     They didn't give me one when I asked for it.

18  So it's been a year after the loan was made.  They never --

19  I never received it, so...

20       Q     You're talking about where you executed a new note

21  and a new deed of trust for ACC Mortgage, is that correct --

22       A     Yeah.

23       Q     -- as part of the settlement of a prior

24  foreclosure?

25       A     Right.

1      Q    But you're currently litigating whether that new

2 note and that new deed of trust are valid, correct?

3      A    That's correct.

4      Q    So it would make sense if they withheld the

5 Certificate of Satisfaction while that's in dispute; is that

6 correct?

7      A    Well, that's not what they're holding it for.

8 They're holding it until the Bankruptcy Court, I guess --

9 what decision was made under the Bankruptcy Court before

10 they go any further.

11      Q    You mean the Court.  The Court is not taking any

12 further action at this time?

13      A    Right.  Until they -- well, I have another court

14 date, but I guess they wanted to hear what the

15 Bankruptcy Court was going to do first.

16           MR. OSTROFF:  The Court's indulgence just a

17 second, Your Honor.

18           May I approach, Your Honor?

19           THE COURT:  Yes.  You don't need to ask

20 permission, Mr. Ostroff.

21 BY MR. OSTROFF:

22      Q    I've just handed you a document titled Date of

23 Trust Note; is that correct?

24      A    Yes.

25      Q    Do you recognize that document?

1      A      Yes, I do.

2      Q      Can you describe what that document is?

3      A      I don't have my glasses, but it's the deed of

4  trust note.

5      Q      That would be the second deed of trust you've

6  executed with ACC Mortgage; is that correct?

7      A      That's correct.

8      Q      And on the last page of that, that bears your

9  signature in two places?

10      A      That's correct.

11      Q      One is a power of attorney for your mother?

12      A      That's correct.

13      Q      On the first page of that document, does it not

14  say that the mortgage is due in full on May 1st, 2015?

15      A      I believe -- yeah.

16      Q      And the mortgage is in the amount of $276,000?

17      A      Yes.

18          MR. OSTROFF:  Your Honor, I'd like to move that

19  into evidence.

20          THE COURT:  No objection?

21          THE WITNESS:  No objection.

22          THE COURT:  That will be received into evidence as

23  ACC Exhibit No. 1.

24  BY MR. OSTROFF:

25      Q      I've just handed you a second document titled Deed

1  of Trust; is that correct?

2       A    Deed of Trust, yes.

3       Q    You cannot be expected to review that, but does

4  that accurately represent the second Deed of Trust you to

5  executed with ACC Mortgage?

6       A    Okay.  Was the first one you gave me the Deed of

7  Trust for the same thing or --

8       Q    Was the note, the Deed Of Trust Note.

9       A    Note?

10      Q    And that's titled Deed of Trust, correct?

11      A    Okay.

12           Yes, this is.

13      Q    And on page, I believe it's 6, is that your

14  signature?

15      A    Yes.

16           MR. OSTROFF:  Your Honor, I'd like to move that

17  into -- the exhibit.

18           THE COURT:  Any objection?

19           THE WITNESS:  No.

20           THE COURT:  Exhibit No. 2 is received into

21  evidence.

22           MR. OSTROFF:  Thank you.

23  BY MR. OSTROFF:

24      Q    If your case is converted to Chapter 11, what is

25  your intention in terms of a plan, a Chapter 11 plan?

1  What is your strategy?  What would you like to see happen?

2       A    Well, in the conversion, I would make a plan to

3  make sure everybody is paid.

4       Q    By "everybody's paid," do you include all of your

5  secured debts?

6       A    All my secured debts?

7       Q    Yes.

8       A    Yes.

9       Q    How do you plan to fund that plan?

10      A    From the income that's -- the potential income

11  that's to come in for the beauty salon, because, like I

12  said, I do have spaces for rent, and there's -- I have

13  people coming to look, and with the income that I already

14  have.

15      Q    How many spaces are there to rent in the beauty

16  salon?

17      A    There's three.  Well, it's individual spaces and

18  it's a floor.  And then it's like, one, two, three different

19  spaces, and then individual booths for rent.

20      Q    Okay.  When's the last time you were completely

21  rented?

22      A    The first of the year.

23      Q    Of 2016?

24      A    Yes.

25      Q    You had how many --

1    A    I had some people in, but they had finished their

2    lease, and they went on to do different things.

3    Q    How many total people did you have renting from

4    you?

5    A    How many people, total people?

6    Q    Uh-huh.

7    A    One, two -- four.

8    Q    And how much was your gross monthly income at that

9    time for the business, or how much was the business's?

10   A    The rent upstairs was like 2,400 each side.

11   THE COURT:  Each what?

12   THE WITNESS:  Each side.  It's two different

13   sides, floors.  Well, it's one floor, but it's two sides.

14   And I just had one other person downstairs for the

15   booth round.  Right now, I just have the one.

16   BY MR. OSTROFF:

17   Q    I'm sorry.  At that time at the first of the -- or

18   the end of last year, how many -- how much income did you

19   get from downstairs?

20   A    For downstairs, it was maybe 500 a week.

21   Q    Total?

22   A    Yeah.  But upstairs, it was -- go under the

23   monthly rate, which was probably about -- a little more than

24   4,000.

25   Q    So based on what you said, and I just want to

1    clarify, I have you've received $4,800 per month upstairs

2    and $500 per month downstairs?

3         A    Uh-huh.  Right.

4         Q    Now, you hadn't been paying ACC the monthly

5    mortgage payment.  What expenditures did Capitol Hill

6    Beauty, LLC, have?

7         A    Well, I had some renovation to, like, do the

8    floors and upgrade it inside pretty much.

9         Q    How much did you spend on renovations?

10        A    I don't have the exact figures right now, but...

11        Q    Estimation.

12        A    Maybe a total of 20,000.

13        Q    Okay.  By my calculations, that would be about

14   four months' rent, correct?

15        A    Uh-huh.  Yes.

16             THE COURT:  Are those expenses already incurred or

17   to be incurred?

18             THE WITNESS:  No.  That's already occurred.

19             THE COURT:  Okay.

20   BY MR. OSTROFF:

21        Q    Did you have any other expenses for the business?

22        A    No.  No more than -- I had tax liens that I

23   cleared up about a year before that.

24        Q    Which aren't -- on which property?

25        A    On the beauty salon.

1     Q     And you stated, again, for the record, your total

2   adjusted income from the business was $20,000?

3     A     Under my personal.

4     Q     Okay.  How much was it for the business?

5     A     Well, that was under my mother at the time, so...

6     Q     But you're the 99 percent owner, correct?

7     A     No.  Other.  LLC.  It's two different things.

8   It's Capitol Hill Beauty Salon, which is the sole of that,

9   and then it's LLC.  It's just -- it's not really the beauty

10  salon, it's just an offset of the beauty salon, in case

11  I wanted to start something.

12          THE COURT:  I don't understand at all.

13          Could you explain what the two different entities

14  are?

15          THE WITNESS:  One is the beauty salon itself.  And

16  I just did an LLC because I wanted to start converting

17  things over to the LLC.  But I never got around to doing

18  that quite yet.

19          THE COURT:  So the LLC is an empty shell?

20          THE WITNESS:  Pretty much.  It's not much going on

21  with it.

22          THE COURT:  What little bit is going on with it?

23          THE WITNESS:  Well, it's there for me to -- that's

24  what I'm saying.  I was trying to change things over to the

25  LLC.

```
 1              THE COURT:  To what extent does the LLC own any
 2   assets?
 3              THE WITNESS:  None.  It doesn't own any assets.
 4              THE COURT:  So if you run this beauty salon,
 5   you're doing that as a sole proprietor?
 6              THE WITNESS:  Yes, that's how the beauty salon is
 7   run.
 8              THE COURT:  Go ahead, Mr. Ostroff.
 9   BY MR. OSTROFF:
10        Q    Okay.  I believe I confused it.  I thought it was
11   one entity.
12        A    No.
13        Q    Who is the sole proprietor?
14        A    Patricia White.
15        Q    Okay.  So your mother owns the salon?
16        A    Right.
17        Q    So she's a tenant in the commercial property?
18        A    Okay.  Yeah.
19              THE COURT:  How does she pay you as a tenant?
20              THE WITNESS:  Does she pay me as a tenant?
21              THE COURT:  Yes.
22              THE WITNESS:  Well, I sort of run the whole place,
23   the salon.  So I get paid, yes.
24              THE COURT:  What do you get paid?
25              THE WITNESS:  As a self-employed.
```

1          THE COURT:  Who pays you that?

2          THE WITNESS:  I get paid under the rents that I

3   collect.

4          THE COURT:  How much rent do you receive from the

5   salon?

6          THE WITNESS:  For right now, right this minute,

7   it's the $250 a week, while I have some potential people

8   coming in by the end of the month.

9          THE COURT:  Let me ask it a little bit

10  differently:  How much does your mother pay you -- if she's

11  the sole proprietor of the salon, how much does she pay you

12  each month?

13         THE WITNESS:  Well, I get paid out of the rent.

14  So I mean, I sort of pay myself because I run the salon

15  right now.

16         THE COURT:  You run the salon.  And what do you

17  collect as a result of --

18         THE WITNESS:  As rent --

19         THE COURT:  -- renting to someone?

20         THE WITNESS:  Well, right now, it's just 250, but

21  I get paid -- how much do I get paid is what you want to

22  know --

23         THE COURT:  Yes.

24         THE WITNESS:  -- when I get paid?  It's 500 a

25  week.

1        THE COURT:  From who?

2        THE WITNESS:  From the rent.  I get paid out of

3   the rent.

4        THE COURT:  And now it's only 250 a month --

5        THE WITNESS:  Right.

6        THE COURT:  -- because you only have one tenant?

7        THE WITNESS:  Right.  So right now I'm not really

8   doing anything right now.

9        THE COURT:  All right.

10  BY MR. OSTROFF:

11       Q    Do you have a lease agreement with your mother or

12  the salon?

13       A    Yes.

14       Q    How much does the lease agreement require her to

15  pay you each month?

16       A    I have to look back and see.  As -- it was done

17  some time ago.

18       Q    Is she --

19       A    I don't know if a figure is stipulated in the

20  lease agreement.

21       Q    Would you say, as a tenant, the beauty salon owes

22  back rent, is current on the rent, or is ahead on the rent?

23       A    You mean does it owe ACC or who are you saying

24  owe?

25       Q    Well, the landlord would be between the owner of

1   the commercial property and the tenant, which is the salon?

2       A    Well, right now I would say back rent because it's

3   not actively fluid.

4       Q    How much back rent?

5       A    I can't say at this time.

6       Q    Can you estimate?

7       A    I would say some months.

8            THE COURT:  How many?

9            THE WITNESS:  Just some months.  I can't say

10  exactly.  Four months.

11           THE COURT:  And what's the monthly rent?

12           THE WITNESS:  Okay.  Well, the place is vacant

13  right now, but the monthly rent is different at different

14  locations.  Like upstairs it's a little bit more than

15  downstairs.

16           MR. OSTROFF:  Your Honor --

17           THE COURT:  Does the sole proprietorship enter

18  into leases with these people who rent spaces?

19           THE WITNESS:  No.  They enter into an agreement

20  with me.

21           THE COURT:  And if your mother runs a sole

22  proprietorship there, what does she garner as income by

23  reason of running a sole proprietorship?

24           THE WITNESS:  Well, it's the rents from -- the

25  total rents from the shop when it's rented.  But right now

1   it's not fluid.  But I'm looking to get it back fluid.

2        Q    Does she collect rents from the people who rent

3   spaces?

4        A    I do.  I collect it.

5             THE COURT:  So what income does your mother earn

6   by reason of this sole proprietorship that is the Capitol

7   Hill Beauty Salon?

8             THE WITNESS:  Well, it depends, because it's not

9   fluid right now.

10            But everything's been taken care of as far as once

11  everything is paid out.  So it's nothing really -- that went

12  to her pro se [sic], just make sure everything is taken care

13  of, all the bills are taken care of.

14            THE COURT:  Who pays for the electricity at the

15  beauty salon?

16            THE WITNESS:  I do.

17            THE COURT:  What kind of heat does it have?

18            THE WITNESS:  Gas.

19            THE COURT:  Who pays the gas bill for the beauty

20  salon?

21            THE WITNESS:  I do.

22            THE COURT:  What expenses of the beauty salon does

23  your mother pay?

24            THE WITNESS:  None.

25            THE COURT:  And she doesn't get any income from

 1    the beauty salon, because the income are the rents, correct?

 2            THE WITNESS:  Correct.

 3            THE COURT:  So she gets no income from the beauty

 4    salon and pays no expenses for the beauty salon?

 5            THE WITNESS:  Right.  I sort of run everything.

 6            THE COURT:  So why do you say she's a sole

 7    proprietor?  She's not paid --

 8            THE WITNESS:  No.  The business under her name is

 9    under sole proprietor.

10            THE COURT:  And what business is that?

11            THE WITNESS:  It's the Capitol Hill Beauty Salon,

12    but...

13            THE COURT:  How can it be a business if it's not

14    operating in the sense of getting income or spending money

15    on expenses?

16            THE WITNESS:  Well, that's just for the beauty

17    salon, because there's other spaces, like upstairs, that

18    could be rented for different other things besides the

19    beauty salon.

20            THE COURT:  She's not renting any of the spaces,

21    whether it's for the beauty salon or for the upstairs.

22            THE WITNESS:  Uh-huh.

23            THE COURT:  So how can it be an active sole

24    proprietorship if she's not at any time getting any income

25    from running the sole proprietorship or making any

1    expenditures in order to operate this sole proprietorship?

2          THE WITNESS:  Well, she pretty much turned it over

3    to me.  It was turned over to me to run things.

4          THE COURT:  Is there anything in paper that

5    designates her as a sole proprietor?

6          THE WITNESS:  Just the business license.

7          THE COURT:  So there's a business license in the

8    name of your mother for running Capitol Hill Beauty Salon?

9          THE WITNESS:  Yes.

10          THE COURT:  Mr. Ostroff.

11   BY MR. OSTROFF:

12     Q    Now, you did not list any accounts receivables on

13   your schedules; is that correct?

14     A    It's lot of things that wasn't listed because of

15   my lack of understanding, until I came into the

16   Bankruptcy Court to see the attorneys.  It's a lot of things

17   that have been clarified.

18          But it's also a lot of things that wasn't done,

19   so...

20     Q    Do you intend to hire a permanent counsel for your

21   Chapter 11 case if it's converted?

22     A    Well, I continue to come here to the

23   Bankruptcy Court to get legal advice.

24          THE COURT:  Are you referring to the bankruptcy

25   assistance center that's once approximately every two

1    Fridays?

2             THE WITNESS:  Yes.

3    BY MR. OSTROFF:

4        Q    But you don't have any intention to hire full-time

5    counsel, permanent counsel for your Chapter 11?

6        A    No.  I thought that would be -- suffice to see the

7    attorneys downstairs.

8        Q    Do you understand the U.S. Trustee's fee structure

9    in the Chapter 11 case?

10       A    The fee structure?  No, I haven't went over that

11   with them yet.

12       Q    Do you intend to employ an accountant?

13       A    An accountant?

14       Q    An accountant?

15       A    No, I hadn't planned to.  Not unless it's needed.

16            If we discuss it downstairs and he tell me, well,

17   this is what you need to do, that's how I'm going to -- just

18   going to go with the advice of the bankruptcy attorney

19   downstairs.

20       Q    You do understand the clinic downstairs is a help

21   clinic, not an attorney, correct?

22       A    Well, he's been helpful.  So I mean...

23       Q    You've seen the same attorney each week?

24       A    Yes.

25       Q    What's his name?

1        A      Jeff.

2        Q      Jeff?

3        A      I forget his last name.

4        Q      Is there any reason that you can give this Court

5    why your case should not be converted to Chapter 7?

6        A      Well, for those reasons.  It's three times the

7    equity in it, and I believe that a plan would be -- suffice

8    to cover whatever debts that was needed.

9        Q      But your plan is going to be funded by projections

10   that you've made in your head, correct?

11       A      No.  Projections that it's going to come into

12   fruition.

13       Q      Over the last five years, how much profit have you

14   personally made on all of your business ventures?  What's

15   the highest level of income you've reported over the last

16   five years, you personally?

17       A      Me personally?

18       Q      Uh-huh.

19       A      I don't know.  I have to go back and see.

20   I couldn't -- I don't want to give an incorrect figure.

21              MR. OSTROFF:  Your Honor, that's all I have at

22   this moment.

23              THE COURT:  Ms. Niklas.

24              MS. NIKLAS:  I have no further questions.

25   Thank you.

 1           THE COURT:  Anything you want to add?

 2           THE WITNESS:  No.

 3           THE COURT:  You may step down.  Thank you.

 4           THE WITNESS:  Thank you.

 5           Any other evidence other than the court record and

 6    the debtor's filings?

 7           MR. OSTROFF:  No, I don't have anything else,

 8    Your Honor.

 9           THE COURT:  Exhibit No. 2 was received into

10    evidence as well, correct?

11           (No verbal response.)

12           THE COURT:  Yes.  All right.

13           And the debtor has no further evidence?

14           MS. HARDY:  Excuse me?

15           THE COURT:  Do you have any further evidence?

16           MS. HARDY:  No.  No more than what I already

17    submitted to the Court.

18           THE COURT:  By way of your testimony?

19           MS. HARDY:  No.

20           THE COURT:  Thank you.

21           Ms. Niklas.

22           MS. NIKLAS:  Your Honor, I strongly believe that

23    with, admittedly, no planned payments, no turned over tax

24    returns, admittedly grossly inadequate, incomplete, and

25    misleading schedules, involving not listing at least 11 or

1    12 creditors, three other properties, I&J completely false

2    and blank, the causes of action against Daniel -- and I keep

3    mispronouncing it -- and not even listing that lawsuit, that

4    dismissal with prejudice is totally justified and

5    appropriate.

6            I also feel that this same issue of the missing

7    and false schedules and incomplete assets, et cetera,

8    prevents a fair conversion to a Chapter 11 or a Chapter 7,

9    because you'd have to have your affairs in order before you

10   can be in a chapter or convert to another chapter.  But

11   I did not take a position regarding the creditor's motion to

12   Convert to 7.

13           Clearly, this was -- this case was filed to attack

14   a creditor, as Chapter 13 was used as a sword, not as a

15   shield.  There's no interest or attempt to organize or

16   provide the Court with any information that's accurate.  So

17   I'm requesting that the case be dismissed with prejudice.

18           And if it is converted to Chapter 7, that the

19   debtor be ordered to immediately file complete and accurate

20   schedules; and, otherwise, it would jeopardize her discharge

21   in Chapter 7.  Thank you.

22           MR. OSTROFF:  Your Honor, as a secured creditor on

23   a property that appears to be oversecured, my client's

24   interest is in the dismissal without -- dismissal with

25   prejudice; however, we also take the position that a

```
1    Chapter 7 conversion may be in the best interest of the

2    estate in this matter, as it is clear the debtor intends to

3    continue to pursue claims which she has not been able to

4    demonstrate have merit against two secured creditors.

5            She stated in her testimony today she has $50,000

6    in unsecured debt, substantial equity in properties for

7    which she's not paying on and which could be subject to

8    other actions of foreclosure, which could prejudice all of

9    the creditors as a whole.  If properties are foreclosed upon

10   for pennies on the dollar, you have -- you've converted

11   equity into losses for everybody.

12           I believe my client will sustain -- will be made

13   whole through a foreclosure; however, the possibility,

14   depending on what goes on in continued litigation or outside

15   the nonbankruptcy world, puts a risk at both our -- what

16   we believe is a secured claim that the debtor's contesting,

17   and, as well, all of the unsecured creditors.

18           Nothing in the debtor's testimony today supports

19   her request for a conversion.  She's provided no feasible

20   possibility of reorganization.  She's provided no statement

21   of an intention to get her affairs in order through the

22   employment of professionals, whether legal or accounting.

23   I'll take the liberty to say that her business enterprise,

24   as described, amounts to a shell game, where it's not clear

25   who owns what and who's supposed to get paid.
```

1          The Chapter 11, if the debtor is a debtor in

2    possession, will have to work on re-organizing, re-engaging

3    both creditors, as well as tenants, to see if a plan can be

4    confirmed, to see if leases can be assumed or rejected.

5          The issue of her doing a joint venture, some kind

6    of sole proprietorship with her mother, which may or may not

7    be making money depending on which statement she made, is a

8    large concern.

9          I believe you would need an independent trustee in

10   a Chapter 11.  I believe the expenses to the Court, she has

11   not demonstrated that she can at this time make the U.S.

12   Trustee's quarterly filing fees.

13         She has not demonstrated by her original schedules

14   or her failure to amend her schedules that she can properly

15   execute monthly operating reports and continue all of the

16   reporting requirements that a Chapter 11 would require.

17         She has failed to even demonstrate that she

18   understands what the Chapter 11 entails.  Her biggest

19   statement being that because this is business related, I can

20   convert to a Chapter 11.

21         I'm seriously concerned with the deleted

22   creditors; with the fact that no other creditors were given

23   notice on behalf -- by the debtor or -- because of the

24   debtor through this Court, no other creditors have had the

25   opportunity to object to conversion, because they were not

1    served with notices.

2            You have secured -- another secured -- sounds like

3    a previous owner who took a security interest in a property

4    sale, as well as condo associations, which have not been

5    paid in years.  All of those parties should be here before a

6    conversion to check on as even considered.  The debtor's

7    made no effort to give them notice.

8            Again, we believe that based on the schedules, the

9    testimony, the omissions and the lack of action by the

10   debtor, her stated reason for filing the bankruptcy, this

11   Court can make the determination that this is a bad-faith

12   Chapter 13 filing; that the case should be dismissed with

13   prejudice or converted to Chapter 7 with the appointment of

14   a Chapter 7 trustee to investigate and liquidate the assets

15   for the benefit of creditors.  Thank you, Your Honor.

16            THE COURT:  I'll hear from the debtor.

17            MS. HARDY:  Yes, Your Honor.

18            I made some mistakes in the Chapter 13.  I didn't

19   submit the -- meet the requirements of the 13.  But

20   I thought when you convert to the 11, that everything is

21   taken care of under that, whatever wasn't done.

22            Like I said, I was going to the bankruptcy's

23   attorneys downstairs, which was giving me legal advice, and

24   said they would be with me solely throughout the process.

25            And basically that's all I have to say.

1        I have enough equity in the property to -- for,

2   you know, to make a plan, and that -- no other bills, my

3   personal bills have been delinquent, just this one with the

4   ACC, and the other one with Dan Caplan, which is in court.

5   So I just ask to accept the conversion.

6        THE COURT:  All right.  Thank you.

7        MS. HARDY:  Thank you.

8        THE COURT:  Ms. Niklas, the statute says, whatever

9   is in the best interest of the creditors, I think.  Let me

10  make sure.

11       MS. HARDY:  Oh.

12       THE COURT:  Either dismiss or convert.

13       My Section 1307(c) says that after a hearing, the

14  Court can either convert the case to Chapter 7 or dismiss

15  the case, whichever is in the best interest of creditors and

16  the estate.

17       I assume that cause has been shown for either

18  dismissal or conversion.

19       Why isn't conversion more in the interest of the

20  creditors and the estate when the record amply demonstrates

21  that they're unpaid, unsecured creditors?

22       She can't do it in Chapter 13.  She -- in the

23  Chapter 7, the trustee can liquidate these assets and pay

24  off the unsecured creditors and -- if I dismiss it, as

25  Mr. Ostroff indicates, the properties can go to foreclosure

1    and the unsecured creditors wouldn't get paid.

2           MS. NIKLAS:  Well, Your Honor, I filed my motion

3    on June 24 just based on the court record, which is zero

4    income and zero et cetera on 10130 and 109 ineligibility.

5           The debtor did not come to the meeting of

6    creditors this Monday.  So I had no information -- and I did

7    not take a position on the conversion.  I simply asked,

8    based on the court record back in June when I saw this

9    dismissal with prejudice, that's the only grounds I had at

10   the time.  Had she come to the meeting of creditors on

11   July 11 and I had examined her similar to today, I would

12   have seen that there are unsecured creditors and there are a

13   lot of other assets.

14          So at this point, I think that it would be in the

15   best interest of creditors to have a 7 trustee liquidate at

16   least the two condos in Maryland.  And based on the values

17   of these businesses that she's testified to, to liquidate or

18   sell at least one or two of these and pay the 50,000 in

19   unsecured creditors.

20          But this information I just received this morning

21   from her testimony, I'm at a loss, because there was no

22   accurate schedules, and I was unaware of the extent of the

23   assets in this case and the amount of unsecured creditors.

24          So I don't take a position on a conversion of

25   Chapter 7, I leave that up to the Court.  It seems that

1    based on these additional unscheduled assets and debts, that

2    it would be in the best interest of creditors to have a

3    conversion of Chapter 7.

4            But I'm concerned to send the chapter -- a case to

5    another chapter that is so grossly and inaccurately filed.

6    Usually, you're going to have one or two assets not

7    scheduled.  There's more unfiled and unscheduled than

8    scheduled.  This is a totally different picture this morning

9    from what the schedules show.

10           So, again, my motion is simply based on what was

11   available to me on June 24th.  I was unaware of the

12   additional issues today.

13           So I don't take a position on Chapter 7, but it

14   does seem, from her testimony, that the creditors would be

15   better off if she were in Chapter 7.

16           THE COURT:  Nothing further, Mr. Ostroff?

17           MR. OSTROFF:  Nothing further, Your Honor.

18           THE COURT:  This has been a hearing on the

19   debtor's motion to convert her case from Chapter 13 to

20   Chapter 11.  And in the trustee's motion to dismiss the case

21   with prejudice based on ineligibility and bad faith, bad

22   faith has been amply demonstrated by reason of the debtor's

23   failure accurately to file schedules.

24           She filed the case to stop a foreclosure sale by

25   Mr. Ostroff's client, ACC, being All Credit Considered,

1    Mortgage Incorporated.

2           She didn't list any of her other creditors.  She's

3    got an ample number of other creditors, including, by your

4    estimate, 50- to $60,000 in unsecured claims.

5           She did not accurately list her expenses and her

6    income.  She didn't list real properties that she owns and

7    the mortgages or condominium fees owed with respect to such

8    properties.

9           Her defense is she thought that she only had to

10   deal with the creditor that was a generating source of

11   her -- the prompting source for her filing the bankruptcy

12   case, meaning the entity whose foreclosure sale prompted her

13   to file the bankruptcy case.  But the schedules clearly

14   indicated that she was supposed to list all creditors,

15   supposed to list all properties, supposed to list all

16   expenses and income.

17          In her testimony, she suggested that she could

18   earn enough income from a business known as Capitol Hill

19   Beauty Salon, but there's no suggestion she's ever made

20   enough income from that enterprise in order to carry out a

21   plan.

22          In her closing argument, she finally says she has

23   enough equity in her properties to make a plan, but she

24   doesn't suggest how she's going to be able, confidently, to

25   carry out a Chapter 11 case, including having enough income

1    each month to pay each court -- excuse me, each quarter to

2    pay the U.S. Trustee quarterly fee.

3           She hasn't given creditors the opportunity to

4    oppose a conversion to Chapter 11, because she hasn't listed

5    all of her creditors.

6           The Court's Local Rules clearly require and the

7    Bankruptcy Code clearly requires that -- the code requires

8    you to list all creditors, and the Court attempted to give

9    all creditors notice of the hearing on the motion to

10   convert -- the fact that the code doesn't require notice to

11   all creditors of a motion to convert but certainly the

12   Court's intention was to give all creditors notice of the

13   opportunity to oppose the motion to convert.

14          The Chapter 13 Trustee's motion, find an issue as

15   to feasibility, mainly the debtor's schedules having

16   indicated she doesn't have the ability to pay any of the

17   expenses that a Chapter 11 would entail.  And creditors

18   should have been allowed to participate in addressing

19   whether the case should be converted to 7 -- to a Chapter 11

20   or, instead, the motion should be denied and the case

21   converted to Chapter 7.

22          The secure creditor, ACC Mortgage, Inc., to whom

23   I've alluded previously, supports a dismissal with prejudice

24   but also has voiced a recommendation that the case be

25   converted to Chapter 7 in light of there being unsecured

1  creditors that have not been paid.

2      Any debtor's financial affairs are complicated by

3  uncertainty as to exactly how her business is structured.

4  She said she's the 99 percent owner of an LLC with her

5  mother, I think, having a 1 percent interest.

6      And at one point, she was suggesting that's the

7  company that operates the beauty salon.  But in further

8  testimony, she indicated that the beauty salon is operated

9  as a sole proprietorship of her mother.  She says that

10  her -- it's on lease between herself and her mother

11  regarding renting the property as a sole proprietorship.

12  But all of the income from the sole proprietorship goes

13  to -- not from the sole proprietorship but from the beauty

14  salon, goes directly to the debtor by way of renting spaces

15  to hairstylists.

16      And the sole proprietorship doesn't have any

17  expenses, other than possibly this possible lease between

18  the debtor and the sole proprietorship.

19      It's all very confusing.  The debtor should have

20  filed accurate schedules when she filed the case or within a

21  reasonable time after filing the case.

22      She'd made no planned payments in the Chapter 13

23  case.

24      There's no suggestion she really has an ability to

25  conduct a Chapter 11 case.  In the circumstances, it's

1    appropriate to convert the case to Chapter 7.

2            A dismissal with prejudice would stay the debtor

3    from filing a bankruptcy case for 180 days and would allow

4    her foreclosures to proceed.

5            I think it's predictable that at least as to some

6    of the entities who have liens against the debtor's property

7    as to which the debtor is in arrears, that the debtor would

8    succeed in dragging out any effort to foreclose.  She would

9    file lawsuits or whatever it would take to delay it, and we

10   would see the debtor come back, filing a bankruptcy case

11   after 180 days and trying to address some of those secured

12   creditors' efforts to proceed with enforcement of their

13   liens.

14           In the circumstances, I think, it's best to

15   convert the case to Chapter 7 and let a Chapter 7 Trustee

16   address what's the best way to maximize the value of the

17   estate, which would benefit the debtor by assuring that

18   whatever equity there is in properties is maximized by way

19   of an only [phonetic] sale instead of a foreclosure sale.

20           So the best interest of creditors and the estate,

21   which includes the debtor's residual interest in the estate

22   after creditors are paid, will weigh heavily in favor of

23   converting the space to Chapter 7.

24           I will warn the debtor that if she fails to amend

25   her schedules and her statement of financial affairs and the

1    other papers that were required to be filed from 14 days

2    after the commencement of the case, if she fails to amend

3    those to accurately list creditors, to accurately list her

4    assets and her debts, her income and her expenses, she faces

5    the prospect that she will be denied a discharge in the

6    Chapter 7 case.

7         This bankruptcy system cannot operate in an

8    appropriate way when a debtor files papers that are

9    knowingly false.

10        It's no excuse for the debtor to say that she

11   thought she only had to deal with the one creditor who's

12   impelling her to file the bankruptcy case.  The schedules

13   and the Statement of Financial Affairs clearly indicate that

14   the debtor's to accurately list information, and she's not

15   done that, and the Court will convert the case to Chapter 7.

16        Thank you, Counsel.

17        MR. OSTROFF:  Your Honor, if I may address the

18   Court one last chance.

19        We did have a request for attorneys' fees, which I

20   reserved on, because I don't think it's appropriate to

21   address pending your decision; however, I suggest that I

22   submit an application or a claim.

23        THE COURT:  Why don't you just claim it as part of

24   your secured claim?  Doesn't your Deed of Trust allow you to

25   do that?

```
 1          MR. OSTROFF:  There is that argument, yes,
 2   Your Honor, I just wanted to preserve our collectability.
 3          THE COURT:  It's not denied.
 4          MR. OSTROFF:  Okay.
 5          THE COURT:  But I'm not going to act on it unless
 6   you file a motion to specify why you think that's the
 7   appropriate course, and spelling out what the fees are.
 8          MR. OSTROFF:  Thank you, Your Honor.
 9          THE COURT:  We're here for a hearing, it's the
10   trustee's motion to dismiss.  I guess your response to the
11   motion to convert -- did you ask for the fees in that or in
12   your own --
13          MR. OSTROFF:  I believe they were asked in both,
14   Your Honor, just to clarify.
15          THE COURT:  Let me make a note.
16          MR. OSTROFF:  It's not in the heading, Your Honor,
17   but it is in one of the paragraphs of the opposition.  It
18   was in the heading of our motion.
19          THE COURT:  All right.  Thank you, Counsel.
20          (Proceedings concluded at 11:40 a.m.)
21
22
23
24
25
```

C E R T I F I C A T E

      I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: December 2, 2016_____   /S/__William P. Zaremba_____

                 William P. Zaremba, RMR, CRR